■ In the Matter of TUMARI W., an Infant. ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent; LYNELL W., Appellant; ANDRE M., Nonparty Respondent. [885 NYS2d 753]—

In a child protective proceeding pursuant to Family Court Act article 10, the mother, Lynell W., appeals from an order of the Family Court, Richmond County (McElrath, J.), dated January 14, 2009, which, without a hearing, authorized the Administration for Children's Services to release the subject child to his father, the nonparty Andre M.

Ordered that the order is reversed, on the law, without costs

or disbursements, and the matter is remitted to the Family Court, Richmond County, for further proceedings consistent herewith.

Following an emergency removal of the subject child from his mother's custody (see Family Ct Act § 1027), the child was placed with the Commissioner of the Administration for Children's Services (hereinafter ACS), who placed the child in kinship foster care with a 28-year-old adult sister. At a court appearance on December 9, 2008, the mother stated that it was "acceptable to her" that the child remain with her older daughter, but she wanted ACS to explore placing the child temporarily with his father, the nonparty Andre M. She also reserved her right to request a hearing pursuant to Family Court Act § 1028 for return of the child to her. The court directed ACS to investigate the father as a possible resource. The father, who was present in court, stated that he intended to return with the child to his house in St. Thomas in the United States Virgin Islands.

At the next court appearance on January 12, 2009, the attorney for ACS recommended that it was appropriate to release the child to the father during the pendency of the neglect proceeding. There is no information in the record as to the basis of this recommendation. The mother objected to the placement of the child with his father, inter alia, on the ground that she felt his home in St. Thomas was not suitable. The attorney for the child was not present, having previously informed the court that he had injured his ankle and would not be able to appear.

Over the mother's objection, the Family Court authorized ACS to release the subject child to his father pursuant to what it characterized as the "privilege of parole." The mother's application to direct the father not to remove the child from New York State was denied on the ground that the father was not a party to the neglect proceeding, and the Family Court did not "have the authority to enter an order against him." The Family Court stayed enforcement of its order to allow the mother to seek appellate review and "allow the law guardian time to object and seek appellate review." We reverse.

As ACS correctly concedes, the Family Court improperly authorized ACS to release the child from its care to the care of the father, who intended to take him out-of-state, over the mother's objection, without the attorney for the child present, without conditions, and without seeking information about the father's home in St. Thomas pursuant to the Interstate Compact on the Placement of Children (Social Services Law § 374-a [1] [hereinafter the ICPC]; see Matter of Shaida W., 85 NY2d 453 [1995];

*Matter of Faison v Capozello,* 50 AD3d 797 [2008]; *Matter of Keanu Blue R.,* 292 AD2d 614 [2002]; Social Services Law § 374-a [1] [art III] [a-d]). Article VIII (a) of the ICPC states that the ICPC does not apply to "[t]he sending or bringing of a child into a receiving state by his parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or guardian" (*see* Social Services Law § 374-a). However, that provision does not apply to the facts of this case. As noted by the Court of Appeals in *Matter of Shaida W.* (85 NY2d 453 [1995]), the "sending agency" was ACS, not the father, since ACS, not the father, had custody.

The dissent attempts to distinguish prior decisions of this Court applying the ICPC to a parent, on the ground that those cases involved a parent "deemed of diminished parental capacity" (*see Matter of Faison v Capozello,* 50 AD3d 797 [2008]; *Matter of Keanu Blue R.,* 292 AD2d 614 [2002]). However, in *Matter of Faison v Capozello,* the father was found to be unsuitable after an investigation pursuant to the ICPC. In *Matter of Keanu Blue R.,* we found that the Family Court erred in releasing the child to the mother in Ohio without compliance with the ICPC. Contrary to the conclusion of the dissent, this line of cases mandates reversal.

*Matter of Alfredo S. v Nassau County Dept. of Social Servs.* (172 AD2d 528 [1991]), relied upon by the Family Court and the dissent, is distinguishable. In that case, the father petitioned for custody pursuant to Family Court Act article 6. However, in the instant case, the father never petitioned for legal custody, and he did not have joint or de facto custody of the child by virtue of living with the child prior to the removal of the child from the mother's custody. Rather, his status is that of a nonparty absentee father.

The dissent asserts that the release of the child to the nonrespondent father was proper pursuant to certain advisory regulations of the ICPC, which state that "[t]he Compact does not apply whenever a court transfers the child to a non-custodial parent with respect to whom the court does not have evidence before it that such parent is unfit, does not seek such evidence, and does not retain jurisdiction over the child after the court transfers the child" (Association of Administrators of the Interstate Compact on the Placement of Children, *http://icpc.aphsa.org/Home/regulations.asp* [Regulation 3 (6) (b), eff Jul. 2, 2001]) (hereinafter regulation 3 [6] [b]). This regulation, which went into effect in 2001, "authorize[s] [the] court to hold the ICPC inapplicable" to a parent *but does not require* such a result, and such a determination may be appealed (*Green v Divi-*

*sion of Family Servs.*, 864 A2d 921, 928 [Del 2004]). Moreover, the regulation does not prohibit the Family Court from seeking further evidence of whether the noncustodial parent, or his or her home, is fit. An issue in this case, reviewable on appeal, is whether the Family Court's failure to seek further evidence was proper. The Family Court's failure to seek further evidence in this case, including evidence pursuant to the ICPC, was improper. In addition, the Family Court's failure to seek input from the attorney for the child was improper.

As noted by the dissent, there is conflicting authority among the various jurisdictions in the nation as to whether the ICPC applies to reunification of a child with a noncustodial parent (*see Bester v Lake County Off. of Family & Children,* 839 NE2d 143, 145, n 2 [Ind 2005]). However, New York State is squarely among those jurisdictions which apply the ICPC to a noncustodial parent (*see Matter of Shaida W.,* 85 NY2d 453 [1995]; *Matter of Faison v Capozello,* 50 AD3d 797 [2008]; *Matter of Keanu Blue R.,* 292 AD2d 614 [2002]; *Matter of Crystal A.,* 13 Misc 3d 235, 237 [2006]).

Nevertheless, the dissent states that ACS was required to release the child to his father pursuant to regulation 3 (6) (b), since the Family Court "neither sought further information nor retained jurisdiction." However, pursuant to statute, the Family Court was not authorized to relinquish jurisdiction over the matter, nor did it. Pursuant to Family Court Act § 1017 (2) (a), the Family Court, not ACS, placed the child with the father, based upon a determination that "the child may reside" with such "non-respondent parent." The fact that the Family Court made this determination based upon no information in the record, other than the conclusory recommendation of ACS, is problematic.

If the Family Court were authorized to relinquish jurisdiction to ACS and a nonrespondent parent in a proceeding pursuant to Family Court Act article 10, such would also relinquish any rights the respondent parent may have to return of the child, in the event that the neglect charges were not sustained, or were found insufficient to justify removal. Indeed, the dissent envisions a procedure whereby the respondent parent, during the pendency of a neglect proceeding, would be required to cross-petition for custody to preserve his or her rights, and would be required to move for a hearing pursuant to *Matter of Tropea v Tropea* (87 NY2d 727 [1996]), to prevent the relocation of the child to another jurisdiction.

The statute envisions a nonrespondent parent petitioning for custody (*see* Family Ct Act § 1017 [2]), and there may be cir-

cumstances in such a case where resort to the ICPC may be dispensed with in the exercise of the court's discretion (*see Matter of Crystal A.,* 13 Misc 3d 235 [2006]; *but see Matter of J.T.,* 22 Misc 3d 1106[A]). Indeed, newly enacted Family Court Act § 1017 (2) (a) (i) and § 1055-b (L 2008, ch 519, §§ 1, 5) expressly authorize the Family Court to grant a nonrespondent parent custody pursuant to Family Court Act article 6, and thereby conclude the Family Court's jurisdiction pursuant to Family Court Act article 10 (*see* Family Ct Act § 1055-b [d]). Although these amendments took effect in March 2009, after the order appealed from was issued, they are expressive of the Legislature's view of public policy concerns.

However, there is no requirement or mention in the statute of a respondent parent cross-petitioning for custody to preserve his or her rights to contest a petition alleging abuse or neglect.

Accordingly, we reverse the order appealed from and remit the matter to the Family Court, Richmond County, for further proceedings consistent herewith. Chambers, Lott and Austin, JJ., concur.

Spolzino, J.P., dissents and votes to affirm the order with the following memorandum, in which Angiolillo, J., concurs: I do not agree that the release of a child to his father requires compliance with the Interstate Compact on the Placement of Children simply because the father has expressed his intention to relocate with the child outside the state. While the mother would be entitled in these circumstances to a hearing to determine whether the relocation is in the best interests of the child (*see Matter of Tropea v Tropea* 87 NY2d 727 [1996]), the Administration for Children's Services (hereinafter ACS), having decided that release to the father posed no risk to the child, has no further role to play in determining where the father and child may live. Thus, despite the concession by ACS, I would affirm the order of the Family Court and, therefore, I dissent, respectfully.

This is one of four contemporaneous child neglect proceedings brought against the mother. The father was not a party. At the initial appearance, on December 9, 2008, the mother consented that the children other than Tumari remain with her 28-year-old daughter. She requested that Tumari be returned to or placed temporarily with his father, who was present in court. The Family Court directed ACS to investigate the father "as a possible resource for Tumari as in *Alfred S.*" The court adjourned the matter to March 24, 2009, to allow ACS to conduct its investigation, and authorized ACS, if the result of the investigation were favorable, to release Tumari to the father

in the interim. When the father expressed his intent to relocate to St. Thomas in March, the Family Court agreed to advance the next court date to January 12, 2009, but did not alter the substance of its order.

The parties returned to court January 12, 2009, at which time ACS reported that the release to the father would not pose a risk to Tumari and stated that Tumari would be released to him. At that point, the mother objected to Tumari being removed from New York. The Family Court rejected the mother's objection and directed that Tumari be released to his father, but stayed enforcement of that order for four days to allow the mother to seek appellate relief. Although the mother then asked that Tumari not be allowed to leave New York State, the Family Court did not rule on that application. The mother took an appeal to this Court on January 14, 2009, and, by decision and order on motion dated February 2, 2009, we stayed enforcement of the order releasing Tumari to his father pending determination of the appeal.

In *Matter of Alfredo S. v Nassau County Dept. of Social Servs.* (172 AD2d 528, 529 [1991]), we held that a child who has been removed from his mother's care by reason of neglect must be released to his father, without reaching the issue of the child's best interests, unless there has been "a threshold showing of 'surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances' to justify the State's intrusion into the family domain" (*id.* at 529, quoting *Matter of Bennett v Jeffreys,* 40 NY2d 543, 544 [1976]; *see Matter of Archer W. v Commissioner of Social Servs.,* 173 AD2d 543 [1991]). The principle that underlay our decision in *Matter of Alfredo S.* is simple and long recognized. "The mother or father has a right to the care and custody of a child, superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood" (*People ex rel. Kropp v Shepsky,* 305 NY 465, 468 [1953]; *see Matter of Male Infant L.,* 61 NY2d 420, 426 [1984]; *Matter of Bennett v Jeffreys,* 40 NY2d at 546; *Matter of Kreger v Newell,* 221 AD2d 630 [1995]; *Matter of Commissioner of Social Servs. of City of N.Y. [Sarah P.],* 216 AD2d 387 [1995]).

This principle underlies the Interstate Compact on the Placement of Children (hereinafter the ICPC) as well. The ICPC applies only where a child is sent, brought or caused to be brought into a state by a "sending agency" for "placement in foster care or as a preliminary to a possible adoption" (Social Services Law § 374-a [1] [art III] [a]). It explicitly excludes from its ambit, among other things, "[t]he sending or bringing of a child into a

receiving state by his parent" (Social Services Law § 374-a [1] [art VIII] [a]). Applying these principles here, the ICPC does not apply.

First, the father is not a sending agency within the meaning of the ICPC. He is Tumari's parent. His decision to relocate to St. Thomas does not alter that status.

Although ACS would be a sending agency had it taken any action with respect to Tumari's relocation, it did not. The majority's conclusion that it did is predicated on its characterization of Tumari's emergency residence with his older sister as a placement in kinship foster care. ACS did not "place" Tumari with the sister, however, in any meaningful sense, at least on the record before us. All that we know, from a comment on the record, is that with the consent of the mother, Tumari was living with the sister at the time of the initial appearance. There is nothing in the record that explains how Tumari came to live with the sister or what the intentions of ACS were with respect to Tumari's continuing care during the proceedings that would follow. In fact, ACS readily assented to the release of Tumari to his father. To call this situation "kinship foster care" overstates the significance of what happened here and elevates a temporary expedient to a legal predicate for the application of the ICPC.

Perhaps more significantly, the role of ACS in determining Tumari's fate had ended even before the relocation became an issue. By the time the mother raised her objection, ACS had completed its investigation and had represented to the Family Court that there was no basis to deny custody to the father, the Family Court had Ordered ACS to release Tumari to his father, and ACS had agreed that it would do so. Nothing in this conduct evinces any intent on the part of ACS to "send" Tumari anywhere other than to live with his father. At most, ACS knew that the father intended to relocate when it made its finding that the father posed no risk to Tumari. Neither that fact, nor the father's parental decision to relocate, implicates the ICPC.

Even if what happened here does constitute a "sending" by an agency within the meaning of the ICPC, however, the ICPC still does not apply. Neither the father nor ACS was sending Tumari to St. Thomas for "placement in foster care or as a preliminary to a possible adoption," as the ICPC requires (Social Services Law § 374-a [1] [art III] [a]). The father's intent, to the extent that it is apparent on the record, is to bring Tumari to St. Thomas to live as part of his family. There is nothing in the record from which it could be concluded that Tumari's living situation thereafter would involve foster care or adoption. That alone defeats any claim to the application of the ICPC.

*Matter of Shaida W.* (85 NY2d 453 [1995]) and its progeny, *Matter of Faison v Capozello* (50 AD3d 797 [2008]), *Matter of Ryan R.* (29 AD3d 806 [2006]), and *Matter of Keanu Blue R.* (292 AD2d 614 [2002]), upon which ACS predicates its concession here, do not require a contrary result, or even suggest that such a result would be appropriate. In each of those cases, unlike the situation presented here, ACS had custody of the child prior to the relocation and the party seeking to relocate the child was either not the child's parent or a parent who had, for some reason, been deemed of diminished parental capacity. In *Matter of Shaida W.,* for example, the Commissioner of Social Services had custody of the children pursuant to a Family Court order, and it was the children's grandmother, in whose foster care the Commissioner wished to place them, who expressed her intent to move to California. *Matter of Ryan R.* involved the release of the children to their paternal aunt and uncle in New Jersey. Although *Matter of Keanu Blue R.* involved the release of the child to his mother, she was to remain under the authority of Ohio child welfare authorities for 12 months. Similarly, in *Matter of Faison v Capozello,* the record contained evidence of extraordinary circumstances overcoming the father's right to custody. There are no such circumstances here and, in fact, ACS conceded before the Family Court that the father was an appropriate custodian.

There is, to be sure, a dispute outside New York as to the role of the ICPC in regulating the relocation of children with noncustodial parents (*see Bester v Lake County Off. of Family & Children,* 839 NE2d 143, 145 n 2 [Ind 2005]; *compare In re Alexis O.,* 157 NH 781, 959 A2d 176 [2008], *McComb v Wambaugh,* 934 F2d 474, 479-482 [1991] *and Arkansas Dept. of Human Servs. v Huff,* 347 Ark 553, 65 SW3d 880 [2002], *with Green v Division of Family Servs.,* 864 A2d 921 [2004] [Del], *Arizona Dept. of Economic Sec. v Leonardo,* 200 Ariz 74, 22 P3d 513 [2001] *and Adoption of Warren,* 44 Mass App Ct 620, 693 NE2d 1021 [1998]). That dispute does not extend, however, to the situation presented here. As the advisory regulations adopted by the Association of Administrators of the Interstate Compact on the Placement of Children provide, "[t]he Compact does not apply whenever a court transfers the child to a non-custodial parent with respect to whom the court does not have evidence before it that such parent is unfit, does not seek such evidence, and does not retain jurisdiction over the child after the court transfers the child" (Association of Administrators of the Interstate Compact on the Placement of Children, http://icpc.aphsa.org/Home/regulations.asp [Regulation 3 (6) (b), eff July 2, 2001]).

That is precisely the situation presented here. ACS was required to release Tumari to his father pursuant to *Matter of Alfredo S.* by a Family Court order that neither sought further information nor retained any jurisdiction. ACS recognized its obligation to Tumari's father and agreed to release Tumari to him even before the Family Court order was issued. Thus, what the majority regards as a "problematic" lack of a record is precisely the basis upon which the Family Court acted—the determination, however informal, by ACS that there was no impediment to the release of Tumari to his father. A record is necessary, in any event, only to keep a child from his or her parent, not to allow the child to be with the parent (*see People ex rel. Kropp v Shepsky*, 305 NY at 468; *see also Matter of Male Infant L.*, 61 NY2d at 426; *Matter of Bennett v Jeffreys*, 40 NY2d at 546; *Matter of Kreger v Newell*, 221 AD2d 630 [1995]; *Matter of Commissioner of Social Servs. of City of N.Y. [Sarah P.]*, 216 AD2d 387 [1995]).

While Tumari's mother had every right to object to the father's intended relocation and she would be entitled, upon properly raising that objection, to a hearing to determine whether the relocation is in Tumari's best interest (*see Matter of Tropea v Tropea*, 87 NY2d 727 [1996]), that is not the issue here. That issue is between Tumari's parents. Neither ACS nor any other state has any legal interest, and the ICPC plays no role, in its resolution.

While I would thus affirm the order of the Family Court, I would not immediately vacate the stay of its enforcement. The circumstances of this case include the fact that Tumari's father has not participated in this appeal. Since Tumari's father expressed his intent to have relocated to St. Thomas by now and, due to his failure to appear on the appeal, it is not possible for us to ascertain whether he is still available to take custody of Tumari, I would continue the stay to allow the Family Court to ascertain whether it is still appropriate to release Tumari to his father and to allow the mother to seek custody, or at least a *Tropea* hearing (*id.*), should she still desire to do so.